UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD LESSARD, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:06-cv-00066 (VLB) |
| RENT-A-CENTER EAST, INC., | : | |
|     Defendant. | : | April 29, 2008 |

## MEMORANDUM OF DECISION GRANTING MOTIONS TO CERTIFY CLASS AND TO PRELIMINARILY APPROVE SETTLEMENT [Docs. #60, 62]

The plaintiff, Todd Lessard, filed this diversity class action on behalf of himself and all similarly situated Connecticut residents against the defendant, Rent-A-Center East, Inc., claiming that the defendant's standard form rent-to-own agreement violates Conn. Gen. Stat. § 42-240 et seq., which governs such agreements. The defendant denies the plaintiff's allegations but has reached a settlement. The plaintiff has accordingly filed motions to preliminarily approve the settlement and to certify a class of approximately 61,000 individuals who entered into rent-to-own agreements with the defendant and a subclass of approximately 21,000 individuals who also purchased the defendant's optional "Benefits Plus" plan. [Docs. #60, 62] For the reasons given below, the motions are GRANTED.

The following facts are relevant to the pending motions. The plaintiff rented a DVD/VCR recorder from the defendant on October 26, 2005, and signed the defendant's standard form rent-to-own agreement. The plaintiff also

purchased the "Benefits Plus" plan, which offered discounts at certain participating businesses and health care providers as well as accidental death and dismemberment coverage.  The plaintiff claims that the rent-to-own agreement and "Benefits Plus" plan violate Conn. Gen. Stat. § 42-240 et seq. in six ways.  The Court will summarize each alleged violation and the defendant's response as part of its settlement.

First, the plaintiff claims that the rent-to-own agreement misstates the difference between the cash price of the product, which is the price at which the defendant would sell the product in exchange for full cash payment, and the rent-to-own price, which is the total sum that the plaintiff would pay if he made all of the rental payments specified in the agreement.  The agreement states that the cash price of the recorder is $298.77 "plus tax."  The agreement then sets forth the rent-to-own prices if the plaintiff elected weekly, semi-monthly, or monthly payment plans.  Those prices are, respectively, $627.49, $627.85, and $628.26, and they include tax.  Finally, the agreement states that the difference between the cash price and the rent-to-own price is $328.72 "plus tax."  That last figure, however, is incorrect.  The difference between the weekly rent-to-own price of $627.49 and the cash price of $298.77 plus 6 percent tax, or $316.70, is $310.79, not the $328.72 "plus tax" stated in the agreement.  Thus, the agreement overstates the difference between the cash price and the rent-to-own price, and that overstatement is to the plaintiff's advantage.  As part of the settlement, the defendant will amend its standard rent-to-own agreement to state the correct

2

difference between the cash price and the rent-to-own price.

The second alleged violation of the rent-to-own statutes is closely related to the first. The plaintiff claims that the defendant's rent-to-own agreement should state the difference between the cash price and the rent-to-own price for each of the three payment plans — weekly, semi-monthly, and monthly — rather than only for the weekly plan. The defendant's revised agreement will provide the difference between the cash price and the rent-to-own price for each payment plan.

The third alleged violation is the failure of the defendant's agreement to mention the "90 days same as cash" payment option that the defendant advertises in its stores. However, the plaintiff does not allege that the defendant fails to honor the advertised payment option. The defendant asserts that the rent-to-own statutes do not require written disclosure of the "90 days same as cash" payment option. Nevertheless, the defendant's revised agreement includes that payment option under the heading "Early Purchase Option."

The fourth alleged violation is the use of the words "lessor" and "lessee" in two sentences in the agreement rather than "we" and "you," which are used in the rest of the agreement except for the signature lines at the bottom of the agreement, which are labeled with the words "lessor" and "lessee." The plaintiff contends that the use of the latter words constitutes a violation of Conn. Gen. Stat. § 42-152(b)(3), which provides that consumer contracts are to use personal pronouns or the actual names of the parties. The defendant's revised agreement

replaces the words "lessor" and "lessee" with "we" and "you" in the two challenged sentences and labels the signature lines "Company" and "Customer."

The fifth alleged violation is the agreement's failure to set forth all of the ways in which the agreement could terminate. The defendant's revised agreement includes all three additions that the plaintiff proposes in that regard, namely, that the agreement terminates upon the customer acquiring ownership of the property or breaching the agreement, or upon the loss, theft, destruction, or excessive damage of the property.

In addition to amending the rent-to-own agreement in those five ways, the defendant proposes to send two free rent vouchers to the approximately 61,000 individuals who entered into rent-to-own agreements with the defendant between December 20, 2002, and July 18, 2007. The vouchers are redeemable subject to product availability. The first voucher offers two weeks of free rent in connection with a new rent-to-own agreement. At the end of the two weeks, the customer may return the rented product and pay nothing. The second voucher offers two weeks of free rent in connection with a new rent-to-own agreement if the customer pays up front for one week of rent. At the end of the free rent period, which is the third week of the lease, the customer may return the rented product and pay nothing beyond the one week of rent. Therefore, each class member will be entitled to four weeks of free rent. The defendant's average weekly rental rate is $27.82, and so each class member's vouchers have a total value of $111.28. The parties estimate that the total value of the vouchers for the entire class will

be approximately $6.78 million.

The plaintiff's sixth and final claim is that the "Benefits Plus" plan, which includes accidental death and dismemberment coverage, violates Conn. Gen. Stat. § 42-243(1), which prohibits the defendant from charging its customers for any insurance other than property insurance. The defendant has agreed to stop offering accidental death and dismemberment coverage in the "Benefits Plus" plan. The defendant will also send a check to each of the approximately 21,000 individuals who purchased the "Benefits Plus" plan. The check will be for either $10 or 30 percent of the amount that the customer paid for the "Benefits Plus" plan, whichever is greater. The parties estimate that the total value of the checks will be approximately $603,000. Dividing that number by 21,000 yields an average of $28.71 per subclass member.

The Court first examines the issue of certification of the class and subclass for settlement purposes. See Amchem Prods. v. Windsor, 521 U.S. 591, 619-22 (1997); Denney v. Deutsche Bank AG, 443 F.3d 253, 262 (2d Cir. 2006). Fed. R. Civ. P. 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." If Rule 23(a) is satisfied, then Rule 23(b)(3) provides that the Court must

find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to the findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

The Court concludes that the class and subclass in the present case satisfy Rule 23(a). First, the class consists of approximately 61,000 individuals, and approximately 21,000 of them comprise the subclass. Both the class and the subclass are so numerous as to make joinder of all members impracticable. Second, there questions of law and fact common to the class because all members signed the same standard form rent-to-own agreement. As to the subclass, all members purchased the same "Benefits Plus" plan. Third, the plaintiff's claims are typical of those of the class and the subclass because he signed the standard form agreement and purchased the "Benefits Plus" plan. Fourth, the plaintiff will fairly and adequately protect the interests of the class and subclass. The plaintiff is represented by qualified and experienced counsel, and his interests are not at odds with those of the class or subclass. See In re Initial Public Offering Securities Litigation, 243 F.R.D. 79, 85 (S.D.N.Y. 2007).

**The Court further concludes that the class and subclass in the present case satisfy Rule 23(b)(3). The questions of law or fact common to class and subclass members predominate over any questions that affect only individual members. Given the standard form agreement and "Benefits Plus" plan, it appears that the issues common to the entire class and subclass predominate over any issues that affect only individual class and subclass members. Finally, a class action is superior to other available methods for fairly and efficiently adjudicating the case. The class and subclass members do not appear to have any interests in individually controlling the prosecution of separate actions, there is no other litigation concerning the controversy that has already been begun by other class or subclass members, and it is desirable to concentrate the litigation in this forum because all of the class and subclass members signed the defendant's agreement in Connecticut.**

**The Court next examines whether to preliminarily approve the settlement. "Unlike settlements in ordinary suits, the settlement of a class action must [be] approved by the court. The court owes a duty to class members to ensure that the proposed settlement is fair, reasonable, and adequate. In making this determination, the court's primary concern is with the substantive terms of the settlement; accordingly, the court must compare the terms of the compromise with the likely rewards of litigation. The trial judge must apprise herself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. The court should not go so far as**

7

to effectively conduct a trial on the merits, but should make findings of fact and conclusions of law whenever the propriety of the settlement is seriously in dispute. The court must also scrutinize the negotiating process leading up to the settlement. A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.

"In determining whether a settlement is fair, reasonable, and adequate, courts in this Circuit look to the well-established Grinnell factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Ultimately, the approval of the proposed settlement of a class action is entrusted to the discretion of the trial court. In exercising that discretion, though, it is axiomatic that the law encourages settlement of disputes." Id. at 82-83.

The Court concludes that preliminary approval of the settlement is appropriate. Under the settlement, the defendant will revise its rent-to-own agreement and send two free rent vouchers to the class and a check to the

subclass. The settlement is fair, reasonable, and adequate because the class and subclass will receive benefits even though there is a lack of evidence of actual damages. The alleged deficiencies of the defendant's rent-to-own agreement are technical, and one of them actually favored the class. As to the subclass, although the "Benefits Plus" plan may have improperly charged for accidental death and dismemberment coverage, the members of the subclass actually received the coverage and will now receive a check for $10 or 30 percent of the amount that the member paid for the plan, whichever is greater. A 30 percent recovery is reasonable because the accidental death and dismemberment coverage constituted just one of the approximately twenty benefits described in the "Benefits Plus" plan. It is unlikely that the class and subclass would be more highly rewarded if this case were to proceed through trial. Although Conn. Gen. Stat. § 42-251(b) provides in relevant part that a violation of the Connecticut rent-to-own statutes gives rise to liability for "actual damages with a minimum recovery of two hundred fifty dollars," there is no evidence of actual damages. Therefore, it is unlikely that the class and subclass could recover $250 per member.

The motions to certify a class and to preliminarily approve the settlement [Docs. #60, 62] are GRANTED. The Court approves the form of notice proposed by the parties and sets a final hearing on the settlement for July 30, 2008, at 11 a.m. in Courtroom Two, 450 Main St., Hartford, Connecticut.

IT IS SO ORDERED.

      /s/
**Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: April 29, 2008.**